(C.D. 3886)

C. J. TOWER & SONS OF BUFFALO, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided September 18, 1969)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*William D. Ruckelshaus,* Assistant Attorney General (*Harold L. Grossman* and *Owen J. Rader,* trial attorneys), for the defendant.

Before RAO, FORD, and ROSENSTEIN, Judges

ROSENSTEIN, Judge: This case involves the proper classification of mineral insulated (M.I.) single and twin wire cable exported in lengths of 853 and 2,553 feet, respectively, without fittings or connectors, from Canada in September 1965. The cable was classified under item 657.30, Tariff Schedules of the United States (TSUS), as articles of copper, not coated or plated with precious metals, and assessed with duty thereunder at the rate of 1.275 cents per pound plus 22.5 per centum ad valorem. Plaintiff contends that the cable is properly classifiable under item 688.05 of TSUS as insulated electrical conductors, whether or not fitted with connectors, without fittings, at 15 per centum ad valorem or, alternatively, under item 688.40 as electrical articles, not specially provided for, at 11.5 per centum ad valorem.

## STATUTES INVOLVED

The pertinent provisions involved herein are as follows:

Articles of copper, not coated or plated
with precious metal:

657.30 Of copper, other than alloys of copper; of nickel silver or of cupronickel _____ 1.275¢ per lb. +22.5% ad val.

Insulated (including enamelled or anodized) electrical conductors, whether or not fitted with connectors (including ignition wiring sets, Christmas-tree lighting sets with or without their bulbs, and other wiring sets):

688.05 Without fittings_____ 15% ad val.
688.40 Electrical articles, and electrical parts of articles, not specially provided for_____ 11.5% ad val.

## THE RECORD

At the hearing, two witnesses testified on behalf of plaintiff, none for defendant.

Mr. Sidney A. Walker, an electrical engineer who is plant manager of Pyrotenax of Canada, Ltd., which manufactured the imported cable, testified that Pyrotenax manufactures M.I. power cables, which are used to transmit electricity from point to point, and M.I. heating cables, which resist the flow of electricity and thereby produce heat. He characterized the subject merchandise as single and twin conductor power cable in which either one or two pure copper conductors are covered by insulating material of magnesium oxide with an outer sheath of copper containing some phosphorus.

The M.I. heating cable manufactured by Pyrotenax has a copper alloy conductor with a copper alloy sheath composed of silicon and manganese. (Although not expressly stated, it appears from the exhibits that the insulating material is the same as that in the imported merchandise.)

Mr. Walker stated that the cable at bar is designed and used to conduct electricity, and that its copper conductor provides the best passage of electricity without too much loss, whereas the "conductors" used in heating cables are composed of resistant materials which produce heat by resisting the flow of electricity. Conductor cable of the kind at bar will heat up slightly if it is carrying too much electricity.

Mr. Carl F. Kreiser, an electrical engineer and vice president of marketing for Edwin P. Wiegand Company of Pittsburgh, for whose account the cable was imported, testified that his company manufactures and sells electric heating equipment for residential, commercial and industrial use. He originated the idea of adding the cable at

bar to his line of products. It is imported for resale to Wiegand's customers "as a means of energizing electrically their equipment, and this product also finds uses in heating applications on occasion, * * *." He has seen power cable of this kind used with fittings or connectors in many states, typically, to convey electrical energy to a motor or other device utilizing electricity. Sometimes the cable is inefficient and generates heat.

The witness stated that the chief use of this cable by September 1965 was to conduct electrical energy with occasional uses for generating heat in snow melting applications. When generating heat, it also conducts electricity. The witness described the cable as an electrical conductor, which he defined as a metal for leading electricity from one point to another, and as an electrical article. Article 330–1 of the publication, *National Electrical Code 1965*, which defines mineral insulated-metal sheathed cable, was received in evidence.[1]

The witness stated on cross-examination that during 1965 he saw cable such as or similar to the merchandise at bar used to conduct electricity in his company's plant and two other companies in Pennsylvania, a factory in Chicago, an aircraft company in Texas, and at the Shell Oil Company in St. Louis. He also observed cable "of this approximate size" in use at the Union Carbide plant in Charleston, West Virginia.

The witness agreed that the importation is capable of being used for both electrical conducting and for heating. Although this is done infrequently, the cable can be used to melt snow and to control temperature by being installed in asphalt, gutters and roofs, or wrapped around pipes, valves and pumps. However, he thinks his heating cable is used for these applications.

## ISSUES AND CONTENTIONS

Plaintiff contends that the instant cable is designed, recognized, and chiefly used as electrical conductor cable; that it is unfinished conductor cable which needs only to be cut to length and attached to terminations (connectors) and fittings; and that its unfinished state does not exclude it from item 688.05 by reason of General Interpretative Rule 10(h) of TSUS.[2] Plaintiff also claims that, even if it were

---

[1] 330–1. Definition and Construction. For the purpose of this Article, mineral insulated-metal sheathed type MI cable is a cable in which one or more electrical conductors are insulated with a highly compressed refractory mineral insulation and enclosed in a liquidtight and gastight metallic tube sheathing. It shall be used with approved fittings for terminating and connecting to boxes, outlets and other equipment.

[2] 10. General Interpretative Rules. For the purposes of these schedules—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

chiefly used for heating purposes, the cable nevertheless conducts electricity and is classifiable as an electrical conductor; however, if found to be excluded from classification under item 688.05, it is more specifically provided for as electrical articles under item 688.40 than as articles of copper under item 657.30.

Defendant argues that item 688.05 is a "use" designation and that plaintiff has failed to establish that the cable is chiefly used as an electrical conductor. It is further claimed that, as the cable is usable either as conductor or heating cable, it is "mere material" out of which conductors and other electrical articles are made, and therefore cannot be an "article" within the meaning of items 688.05 and 688.40. Although defendant agrees that a classification under item 657.30 is "broader in scope" than one under item 688.40, it contends "without arguing the merits of this position" that plaintiff has failed to show that the latter provision more specifically describes the merchandise than item 657.30.

## Item 688.05

We have carefully considered plaintiff's claim that the "insulated * * * electrical conductors" provision encompasses all insulated electrical articles which conduct electricity, whether such transmission be its chief use or only incidental thereto, and whether or not they are cut to length.

We agree at the outset with plaintiff that the importation of electrical cable in continuous rolls does not exclude it from classification under item 688.05 in light of the language of the superior heading, "whether or not fitted with connectors", and of the item itself which provides for conductors "without fittings". The breadth of the wording used therein indicates an intent to cover electrical conductors even if not cut to length.

We also note that the *Tariff Classification Study, Explanatory and Background Materials*, November 15, 1960 (prepared by the Tariff Commission for the use of Congress in considering the proposed revised schedules), states in schedule 6, part 5, at page 307, that—

> * * * Item 688.05 covers insulated electrical conductors without fittings at the rate of 15 percent ad valorem currently applying thereto under paragraph 316. * * *

Paragraph 316(a), Tariff Act of 1930, which provides for—

> * * * telegraph, telephone, and other wires and cables composed of iron, steel, or other metal (except * * *), covered with or composed in part of cotton, jute, silver, enamel, lacquer, rubber, paper, compound, or other material, with or without metal covering, * * *.

embraces insulated cable not cut to length or dedicated to a specific use. It would appear then that the TSUS provision for electrical con-

ductors carved out of the earlier tariff act is intended to be equally broad in scope.[3]

However, construing this item in *pari materia* with the other provisions in schedule 6, part 5, "Electrical Machinery and Equipment", it is readily apparent that item 688.05 is limited in its scope. Heating cable, for example, comes within the purview of item 684.50 which, read in concert with its superior heading, provides for "* * * electric heating resistors other than those of carbon; * * * other".[4] If plaintiff's claim as to the all-embracing scope of this provision were adopted, it would conflict with and invade many other designations in part 5 of schedule 6, not to mention provisions located elsewhere in TSUS, a result hardly intended by Congress which had hoped through tariff revision to eliminate such anomalies.

Therefore, we must perforce conclude that item 688.05 was designed to provide for items used chiefly for one specific purpose, namely, to conduct electricity; and that Congress intended to draw a distinction in TSUS, based upon use, between electrical conductors and other electrical articles which also conduct electricity but only as a concomitant to some other function.

Our construction of this provision is supported by the *Nomenclature for the Classification of Goods in Customs Tariffs* (popularly known as the *Brussels Nomenclature*) which exerted the greatest influence in the arrangement of the proposed revised (TSUS) schedules. *Jerome Trading Corp.* v. *United States*, 62 Cust. Ct. 268, C.D. 3742 (1969); *American Express Company* v. *United States*, 61 Cust. Ct. 208, C.D. 3573, 290 F. Supp. 778 (1968).[5]

---

[3] The statement under heading 85.23 in the *Explanatory Notes to the Brussels Nomenclature* discussed *infra* p. 11, that—

> Wire, cable, etc., remain classified in the present heading if cut to length or fitted with connectors (e.g., plugs, sockets, lugs, jacks, sleeves or terminals) at one or both ends. * * *

also evinces an intent to include such articles when imported in indefinite lengths.

[4] The superior heading covers—

> Electric instantaneous or storage water heaters and immersion heaters; electric soil heating apparatus, and electric space heating apparatus; electric hair dryers, hair curlers, and other electric hair dressing appliances; electric flatirons; electro-thermic kitchen and household appliances; electric heating resistors other than those of carbon; all the foregoing and parts thereof:
>
> *        *        *        *        *        *        *

Plaintiff's original claim for classification under this item as electric heating resistors was abandoned at the trial.

The *Summaries of Trade and Tariff Information*, Schedule 6, Volume 10 (1969), prepared by the United States Tariff Commission as a source of factual information on the tariff items provided for in TSUS, comments on item 684.50 as follows (p. 245):

> Electric heating cables are specially insulated resistance heating wires imbedded in wall board or in a vinyl wall covering which is applied like wall paper. * * *

We do not consider here, as not pertinent to this opinion, whether item 684.50 includes articles not cut to length.

[5] We do not construe the recent decision in *F.L. Smidth & Company* v. *United States*, 56 CCPA 77, C.A.D. 958 (1969), as precluding judges from "seeking light wherever they can find it" in ascertaining the congressional intent.

A provision substantially similar to item 688.05 is designated in the *Brussels Nomenclature* under heading 85.23 and is described in the *Explanatory Notes* thereto as follows:

> 85.23—INSULATED (INCLUDING ENAMELLED OR ANODISED) ELECTRIC WIRE, CABLE, BARS, STRIP AND THE LIKE (INCLUDING CO-AXIAL CABLE), WHETHER OR NOT FITTED WITH CONNECTORS.
>
> Provided they are insulated, this heading covers electric wire, cable, braids, bars, strip, etc., *used as conductors* in electrical machinery, apparatus or installations. *Subject to this condition,* the heading includes wiring for interior work or for exterior use (e.g., underground, submarine or aerial wires or cables). These goods vary from very fine insulated wire to thick cables of more complex types. [Emphasis supplied.]
>
> The goods falling within this heading are made up of the following elements:
>
> (A)  A conductor—this may be single strand or multiple, and may be wholly of one metal or of different metals.
>
> (B)  One or more coverings of insulating material—the aim of these coverings is to prevent leakage of electric current from the conductor, and to protect it against damage. * * *
>
> (C)  In certain cases a metal sheath * * *.
>
> (D)  Sometimes a metal armouring * * *.

\*    \*    \*    \*    \*    \*    \*

The *Explanatory Notes* also point up the distinction made in the *Brussels Nomenclature* between articles utilizing the properties or effects of electricity and those which are used as conductors of electricity. Thus, the *Notes* state, at page 923, that Chapter 85, "Electrical Machinery and Equipment; Parts Thereof", covers, among other articles—

> (3)  Certain machines and appliances which depend for their operation on the properties or effects of electricity, such as its electro-magnetic effects, *heating properties*, etc. (headings 85.02, 85.08 to 85.17 and 85.22).[6]

\*    \*    \*    \*    \*    \*    \*

---

[6] Heading 85.12, which is substantially the same as the superior heading to item 684.50 of TSUS, reads as follows:

85.12— ELECTRIC INSTANTANEOUS OR STORAGE WATER HEATERS AND IMMERSION HEATERS ; ELECTRIC SOIL HEATING APPARATUS AND ELECTRIC SPACE HEATING APPARATUS ; ELECTRIC HAIR DRESSING APPLIANCES (FOR EXAMPLE, HAIR DRYERS, HAIR CURLERS, CURLING TONG HEATERS) AND ELECTRIC SMOOTHING IRONS ; ELECTRO-THERMIC DOMESTIC APPLIANCES ; ELECTRIC HEATING RESISTORS, OTHER THAN THOSE OF CARBON

The *Explanatory Notes* state (p. 944) :

With the exception of those of carbon (heading 85.24), all electrical heating resistors are classified here, whether for use in the apparatus of the present heading or in electrically heated apparatus of other headings.

They consist of bars, rods, plates, etc., or lengths of wire (usually coiled), of special material which becomes very hot when current is passed through it. The material used varies (special alloys, compositions based on silicon carbide, etc.).

\*    \*    \*    \*    \*    \*    \*

(5) Certain articles and materials which are used in electrical apparatus and equipment *because of their conducting or insulating properties*, such as insulated electric wire and assemblies thereof (heading 85.23), insulators (heading 85.25), insulating fittings of heading 85.26, and metal conduit tubing with an interior insulating lining (heading 85.27). [Emphasis supplied.]

In light of our construction of item 688.05, it was incumbent upon plaintiff to establish that the presumptively correct classification of the collector herein is incorrect and that the subject cable is of the class or kind chiefly used as electrical conductors within the framework of the "use" test of General Interpretative Rule 10(e)(i) of TSUS, which provides that—

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

Thus, chief use of articles of the class or kind as those at bar at, or immediately prior to, the date of importation is the criterion for ascertaining use. *Hoffschlaeger Company, Ltd., American Customs Brokerage Co., Inc., et al.* v. *United States*, 60 Cust. Ct. 497, C.D. 3440, 284 F. Supp. 787 (1968).

Plaintiff sought to discharge its burden by offering testimony to establish that the M.I. cable at bar is chiefly used to conduct electricity, and that it differs from M.I. heating cable also produced by the Canadian manufacturer herein.

The witness Kreiser testified, in connection with the imported cable, that in and about September 1965—

The chief uses *by that time* were principally for conducting electrical energy to equipment of the type illustrated here with occasional uses for generating heat in snow melting applications. [R. 36.] [Emphasis supplied.]

This statement, coupled with the witness' admissions on cross-examination that the subject cable could be, and had been, used in various applications for heating purposes, strongly suggests that the commodity had been chiefly used other than as an electrical conductor for some time prior to September 1965, and raises the question whether, in fact, there was a shift in its chief use. Mere assertions as to the cable's principal use at or immediately prior to the date of importation do not satisfactorily answer this question absent substantial proof thereof.

Although his company sells this cable to "as many as our 25,000 cus-

tomers" throughout the country, Kreiser was able to name only six companies, besides his own, where he had observed, during the first nine months of 1965, the use of such or similar cable to conduct electricity. Three plants are located in Pittsburgh; the others are in Illinois, Texas and Missouri. In October 1965 he also saw "cable of this approximate size" used as an electrical conductor in a West Virginia plant.

The foregoing encapsulates the extent of the witness' testimony regarding the ultimate uses of cable of the class or kind at bar during the period in issue. Although the record indicates that the Wiegand Company, the ultimate consignee herein, is not the sole purveyor or distributor of mineral insulated cable, there is no testimony relative to the sales or uses in this country of such or similar products manufactured or distributed by other companies.

The requirements for chief use are set forth in *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, 164, 165, C.A.D. 544 (1953), as follows:

> While judicial notice may be taken of well known uses of an article, chief use is a question of actual fact which, in a case of this character, should be established on the basis of positive testimony representative of an adequate geographical cross section of the nation. In other words, we are reluctant to disturb the presumption of correctness attaching to the collector's classification in the absence of unequivocal proof successfully contradicting the validity of such classification

In the opinion below, Judge Lawrence, speaking for the court, succinctly stated:

> In order to succeed in their contention that the articles under consideration are not illuminating articles, it was incumbent upon plaintiffs to establish by competent evidence that the articles are not chiefly used for illuminating purposes. * * * The fact of chief use is difficult to prove. It ordinarily entails rather exacting evidence of use throughout the United States and cannot depend upon evidence of use locally. It appears from the record that the testimony of plaintiff's witnesses to which, reference has been made, *supra*, covered a relatively narrow field—in and about New York, with an isolated instance in Oklahoma—which certainly falls short of the requirements of proof of chief use. [Cases cited.]

In *Hoffschlaeger Company, Ltd., American Customs Brokerage Co., Inc., et al.* v. *United States*, *supra*, this court stated, with respect to General Interpretative Rule 10(e)(i)—

> It is also well settled that evidence limited to use in one state, or in one part of the country, is insufficient to fulfill the territorial requirement of proof of chief use, unless it be shown that the area of established use is the principal or only area of use of the article in issue. Thus for example, proof of chief use in the State

of California was held, in *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, T.D. 42240, insufficient to establish chief use in the United States. In *The A. W. Fenton Co., Inc.* v. *United States*, 40 Cust. Ct. 327, C.D. 2002, it was found that testimony by a thoroughly qualified witness as to uses in California, Michigan, and Ohio was inadequate to meet the territorial requirement since uses in other parts of the country could differ. In the case of *Bob Stone Cordage Co., et al.* v. *United States*, 51 CCPA 60, C.A.D. 838, although witnesses testified to uses in Nebraska, Oklahoma, Kansas, Arkansas, Missouri, and Iowa, the court decided that, since the principal area of use was the entire Middle West, such evidence could not establish chief use in the nation.

And see *Maui Varieties Ltd., American Customs Brokerage Co., Inc., et al.* v. *United States*, 56 CCPA 36, C.A.D. 950 (1968).

Plaintiff has not met the test of chief use as enunciated in the foregoing cases.

Nor can we find from the record herein that "the peculiar character and special design of the articles at bar demonstrate *per se* that their use throughout the country could be only that use testified to by the witnesses." *Hoffschlaeger Company, Ltd., American Customs Brokerage Co., Inc., et al.* v. *United States, supra.*

Whatever significance there may be with respect to the difference in composition of the wire and outer metal sheath used in the imported M.I. "cold" cable and the M.I. heating cable produced by Pyrotenax is unclear, particularly since the "conductor" wire in the imported cable also functions as a resistor under certain circumstances. The explanation that the latter is used for heating purposes only when "carrying too much electricity" (R. 17) and "inefficient" (R. 35) is highly unsatisfactory absent other clarifying data. We do not know, for instance, the quantum of heat given off by the instant cable or of heating cable; nor does the record establish, as plaintiff claims, that the wires used in M.I. power and M.I. heating cable are always made of pure copper and copper alloy, respectively.[7]

This court may not speculate, on the meager showing herein, that the cable at bar is fabricated of materials which suit it principally for use as electrical conductors, or that it is chiefly so used throughout the United States. The record is too vague to support such findings. Therefore, plaintiff's claim for classification under item 688.05 must fall.

### Item 688.40

Defendant counters plaintiff's alternative claim under item 688.40 by contending that the subject merchandise, which may be utilized as both conducting and heating cable, has "no particular use to which it

---

[7] The definition of mineral insulated-metal sheathed type M.I. cable contained in the *National Electric Code 1965* (exhibit 9) does not specify the composition of the electrical conductors.

is dedicated" and is "merely material out of which electrical articles are made." It is not seriously disputed that the item is electrical. (Defendant's brief states that all of its uses are "electrical in nature.") The gravamen of the government's position herein is that the cable is an article of copper for purposes of item 637.30, but not an electrical article within the purview of the claimed provision.

We find this argument somewhat sophistic: neither the legislative history of item 688.40 nor the cases cited by defendant support its position.

There is no one meaning to be assigned to the term "article". In *D.N. & E. Walter & Co., et al. v. United States*, 44 CCPA 144, 147, C.A.D. 652 (1957), our appellate court stated:

> In the *Eimer & Amend* case [28 CCPA 10, C.A.D. 117 (1940)] cited by the Customs Court, this court had occasion to point out that the word "articles" is used hundreds of times in most tariff statutes; that Congress clearly meant it to have a broad meaning in some provisions and a restricted meaning in others; and that *it has meanings varying with the purposes to be accomplished.* * * * [Emphasis copied.]

Thus, in *Asiam, Inc., et al. v. United States*, 69 Treas. Dec. 197, T.D. 48133 (1936), upon which defendant relies, the court held that "articles" was used in a "very narrow sense" in paragraph 31, Tariff Act of 1922. In that case, cellulose filaments in the form of yarns which were to be used for weaving, knitting or braiding into various types of fabrics or articles of wearing apparel were held properly dutiable under the first part of that paragraph as compounds of cellulose in blocks, sheets, rods, tubes, or other forms, not made into finished or partly finished articles, rather than under the latter provision thereof as cellulose compounds made into finished or partly finished articles.

It was apparent, the court noted therein, that Congress intended to treat the merchandise covered by the first part of paragraph 31 as mere material and that covered by the latter part as articles either finished or partly finished. As for the merchandise therein, it—

> * * * has been processed no further towards the various types of fabrics or various articles of wearing apparel into which ultimately it is to be manufactured, than the shape or form of single yarns in skeins. A person could scarcely look at the yarns in question and see a finished or partly finished bolt of cloth, or a finished or partly finished dress.[8]

The *Asiam* decision, which involves merchandise in the early stages of fabrication and a totally different provision from that before us, is not relevant to the issues herein. Unlike the cellulose filaments in that case, the cable at bar is a manufactured article, electrical in nature,

---

[8] 69 Treas. Dec. 201.

which needs only to be cut to length and attached to fittings and connectors.

We have carefully considered the other cases relied upon by defendant, but find that they are not pertinent to the issue herein.

Although we find no case specifically in point, *D.N. & E. Walter & Co., et al. v. United States, supra,* is analogous to the matter at hand. In that case, the importer contended that long rolls of bamboo material, used to make draperies, window shades, floor screens, cornices and the like by cutting the rolls into smaller sections and binding and trimming the edges, were not "articles" within the meaning of paragraph 409, Tariff Act of 1930, providing for "* * * all articles not specially provided for, wholly or partly manufactured of * * * bamboo," and that Congress intended to exclude uncompleted articles from that paragraph.

The appellate court rejected the contention "that a thing is not an article unless it is complete and ready for its ultimate use", and held that the bamboo rolls were articles under paragraph 409 "which was evidently intended to include all of the articles wholly or partly manufactured of bamboo which had not been more specifically provided for * * *." [9] The court cited *Lussky, White & Coolidge, Inc. v. United States,* 21 CCPA 201, T.D. 46727 (1933), and *Joshua Hoyle & Sons, Ltd., et al. v. United States,* 22 CCPA 265, T.D. 47326 (1934), wherein upholstery cloth "in the piece" and cotton goods used for making typewriter ribbons, respectively, were held subject to the additional duty prescribed by paragraph 924 for all "articles" enumerated or described in schedule 9; *Lunham & Reeve, Inc. v. United States,* 28 CCPA 268, C.A.D. 153 (1940), involving zinc strips imported in coils and later treated and finished to make material for binding linoleum, shoe eyelets, radio connectors, etc., which were held to be "articles" within the meaning of paragraph 397; and *Braun-Steeple Co. et al. v. United States,* 18 CCPA 437, T.D. 44683 (1931), in which steel sheets perforated with fancy designs and cut to shape after importation to make radiator covers, bed panels, fire screens, etc., were held to be "articles * * * whether partly or wholly manufactured" under paragraph 399, Tariff Act of 1922, rather than sheets, plates, or steel, not specially provided for, under paragraph 304.

Furthermore, we see in the design of the revised schedule, notably the sections bearing on electrical machinery, equipment and instruments, that item 688.40 was intended to serve as a basket provision for all electrical articles not specially provided for,[10] particularly those electrical items which, under the Tariff Act of 1930, had been relegated, for lack of a more specific provision, to the basket clauses based upon component material of chief value.

[9] 44 CCPA 149.
[10] See *J. E. Bernard & Co., Inc. v. United States,* 62 Cust. Ct. 536, C.D. 3822 (1969).

Thus, the *Tariff Classification Study, Explanatory and Background Materials*, Schedule 6 (1960) states, with reference to part 5, at page 302:

> This part includes many new provisions specially covering various electrical articles and electrical components of articles which are presently classifiable under various general tariff descriptions, "parts" provisions, and "basket" provisions usually based upon component material of chief value. The provisions often clash head-on and produce uncertain and anomalous classification results.

and at page 308:

> Item 688.40 is the "basket" provision in part 5 for "electrical articles, and electrical parts of articles,". This item does not apply to any article classifiable as a machine and the provision for electrical parts of articles applies to articles identifiable as parts of machinery or apparatus but not as parts of a particular machine or apparatus.

By adopting the recommendations of the Tariff Commission, Congress approved that body's stated intention of divesting such broad catchall provisions as paragraph 397 [11] of groups of significant classes of articles and assimilating them in the appropriate parts and subparts of the proposed revised schedules. Although the result in this case may appear to be one which simply replaces a larger basket with a smaller one, it carries out, to the extent practicable, the Tariff Commission's goal to particularize, whenever possible, the various lines of imported merchandise.[12]

It is patent from the foregoing that the test of "dedication" to a specific use which is urged by defendant would vitiate the "basket" feature of item 688.40 and eliminate therefrom the very articles it was intended to include.

Therefore, we find that the subject cable is an electrical article within the meaning of item 688.40. Although unfinished, in that it is cut to length and fitted to connectors and terminal points after importation, it remains within the tariff description of item 688.40 by reason of General Interpretative Rule 10(h).

The doctrine of relative specificity, which is a rule of construction used as a means to ascertain the intent of Congress, does not come into play in this case by reason of the clearly shown legislative intent, discussed *supra. National Carloading Corp.* v. *United States*, 44 CCPA 77, C.A.D. 640 (1957); *Cornet Stores et al.* v. *United States*, 44 Cust. Ct. 114, C.D. 2162 (1960).

---

[11] This paragraph embraces "Articles or wares not specially provided for, if composed wholly or in chief value of platinum, gold, or silver, * * * iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, * * * whether partly or wholly manufactured, * * *."

[12] *Tariff Classification Study, Submitting Report,* Nov. 15, 1960, Part II.

However, application of the relative specificity doctrine would compel the same conclusion. Item 657.30 is subject to the headnote to subpart G, "Metal Products Not Specially Provided For", of part 3, which states—

> This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

The provision of item 688.40 for "electrical articles * * * not specially provided for" more closely describes the electrical cable at bar and is more limited in scope than the general language of item 657.30. Therefore, we find that the former item provides more specifically for the merchandise herein than the one under which it was classified.

Plaintiff's claim for classification under item 688.40 is sustained; its claim under item 688.05 is overruled, and the claim under item 684.50 is dismissed. Judgment will issue accordingly.