(C.D. 4227)

Mitsubishi International Corp. *v.* United States

United States Customs Court, Third Division

(Decided June 3, 1971)

*Brooks & Brooks* (*Charles P. Deem* of counsel) for the plaintiff.
*L. Patrick Gray, III,* Assistant Attorney General (*Peter Jay Baskin* and *John A. Winters,* trial attorneys), for the defendant.

Before RICHARDSON and LANDIS, Judges

LANDIS, Judge: This protest involves manufactured articles described as "NGK Insulators [1] (Machinery Parts of Porcelain for Lighting [sic] Arresters)," imported from Japan and entered at New York.

Customs classified the articles as dutiable at 30 per centum ad valorem under TSUS (Tariff Schedules of the United States) item 535.14, which, in the pertinent context of schedule 5, part 2, subpart D, provides as follows:

| | | |
|---|---|---|
| | Ceramic magnets, ceramic electrical insulators whether or not in part of metal, and other ceramic electrical ware, including ferroelectric and piezoelectric ceramic elements: | |
| 535.11 | Porcelain insulators, with metal parts cemented thereto and comprising not less than 30 percent of the weight thereof, used in high-voltage, low-frequency electrical systems _____ | * * * |
| 535.12 | Ferrites _____ | * * * |
| 535.14 | Other _____ | 30% ad val. |

---

[1] Insulators are articles used for "the fixing, supporting or guiding of electric current conductors while at the same time insulating them electrically from each other, from earth, etc." Explanatory Notes to the Brussels Nomenclature (Volume III, heading 85.25, page 971), 1955.

Plaintiff claims [2] that the articles should be classified as parts of lightning arresters,[3] dutiable at 17.5 per centum ad valorem, under TSUS item 685.90. In the pertinent context of schedule 6, part 5, TSUS item 685.90 appears as follows:

Part 5 headnotes:

1. This part does not cover—
 (i) electrical insulators or insulating materials (classifiable in other schedules according to materials of which made);

 * * * * * * * *

 (iii) ceramic electrical ware (part 2D of schedule 5);

 * * * * * * * *

| | |
|---|---|
| 685.90 Electrical switches, relays, fuses, lightning arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof _____ | 17.5% ad val. |

The official papers are in evidence. On trial, counsel stipulated that the imported articles are not ceramic magnets. Neither side disputes the presumption that the articles before us are a "ceramic article" as defined in schedule 5, part 2, headnote 2(a). Two witnesses testified for plaintiff. There is also testimony from one witness for defendant.

Exhibit 2 in evidence, a physical sample, is illustrative of the imported articles in the condition imported. It is concededly a ceramic housing (the imported article shall hereinafter be referred to as a "housing") of one piece circular construction, approximately 4 feet high, weighing between 400 and 500 pounds. The outside configuration is that of circular spaced saucers (about 12 inches in diameter), rising in a pyramid one above the other, forming what one of plaintiff's witnesses referred to as a "shed" profile. Exhibit 3, a photograph,

---

[2] Plaintiff abandoned all other claims.

[3] Lightning arresters are protective devices designed to protect high tension cables or electrical installations from the effects of lighting; they consist of a device normally insulating to the high tension line but which breaks down and becomes a conducting path to earth in the event of exceptionally high voltages which otherwise would damage the line or electrical installation. Among the many types are carbon granule arresters, arresters consisting of a horned spark gap or guard shield mounted on an insulator or an insulator chain, electrolytic arresters, lead oxide arresters, etc. Brussels Nomenclature, n. 1, heading 85.19, page 960.

shows the housing (marked A) in profile [4] with a complex of inside elements not contained in exhibits 2 which is illustrative of the imported articles. A copy of exhibit 3, reduced in size, is as follows:

Plaintiff's first witness, Mr. Kotaro Saito, sales representative for NGK Insulators of America, testified that the ceramic housings were imported on purchase order from General Electric Company, Distribution Protective Equipment Department, Pittsfield, Mass. (Exhibits 1–A, 1–B,[5] 1–C.) No one disputes the fact that the ceramic housings were delivered to General Electric Company, Pittsfield, Mass., and that General Electric Company uses them in assembling lightning arresters.

[4] Exhibit 4, General Electric Company catalogue GEA–7687C, is limited to picture of the same profile on page 10.
[5] Defendant's exhibit A–1 is a letter from Mr. Saito to the New York Regional Commissioner of Customs dated April 21, 1969, enclosing a drawing (exhibit A–2) of the same article as that specified in exhibit 1–B.

Mr. Saito stated that on his regular trips to the General Electric plant in Pittsfield he observed the ceramic housings assembled with metal fittings and inside components for the lightning arrester of General Electric. When cross-examined, Mr. Saito testified that he knew the housings were used for lightning arresters because lightning arresters are all that General Electric, Pittsfield, manufactures in its distribution protective equipment department, and that he could state "just from the drawing [exhibit 1–B] * * * that [the] shell is used as part of a lightning arrester, and nothing else."

The second witness for plaintiff was Mr. Masami Okayama, an electrical engineer, employed by NGK Insulators, Ltd., Japan. He testified his duties include design of many kinds of insulators for transmission lines and substation use, and engineering services to customers in the United States, including General Electric. He stated that he was familiar with the "shells" illustrated by exhibit 2 and that, in the terminology of his company, they are called porcelain housings. His company uses the word "insulators" to connote articles such as post type insulators used on transmission lines.

On his visits to the General Electric plant at Pittsfield Mr. Okayama testified that he, also, observed the housing assembled to internal elements. He was of the opinion that because of the many details specified in the General Electric drawing, particularly the "shed profile", the housings had no application other than for lightning arresters of the General Electric type. The "shed profile", he said, was uniquely adapted for General Electric and his company did not make a housing of the same design for any other customer.

When assembled with the internal elements and fittings to make a lightning arrester, Mr. Okayama testified that the housing functions to protect the inside components from extreme weather conditions. The housings are made of porcelain because some electrical insulation is required between the energized part and the grounded part of the arrester. The energized part, a metal fitting (marked B on exhibit 3) on top of the arrester, is connected to the electrical circuit, and a metal fitting (marked C on exhibit 3) on the bottom of the arrester, is grounded to the earth. While Mr. Okayama did not go into the specifics of the internal elements, if we understand his testimony correctly, those elements operate as a series of "sparking gaps" that take excess high voltage (of potential damage to electrical equipment such as transformers), induced by lightning stroke or otherwise, and pass it to the ground.

On cross-examination, Mr. Okayama stated that, from the drawing (exhibit 1–B) and "just looking" at exhibit 2, he could say that the article specified in the drawing, and the imported article illustrated

by exhibit 2, "is suitable for use only as a lightning arrester shell". He also testified that the "shed profile" of exhibit 2 could be applied to other types of insulators, but that the detail and design of exhibit 2 were not applicable to other insulators; that exhibit 2 is an electrical insulator but not in a functional sense because its main function is to protect against the ravages of weather; that it could be said that exhibit 2 is suitable for use as an electrical insulator, and that, in fact, the primary function of exhibit 2 is insulation, and another characteristic is that of protection against weather.

On redirect examination, Mr. Okayama was asked to state what he considered to be the primary and secondary function of the imported housings, and replied:

> The first function—I think it's very difficult to get the order of of the function, primary or secondary; so I answer: The main function is, of course, insulation between the electrode, the energized part and the grounded part; and another important function is weatherproofing. These two functions is [sic] very important.

Mr. Arnold G. Yost, an electrical engineer, employed by Ohio Brass Company, and extensively qualified to testify in the field of lightning arresters and related electrical equipment, testified for defendant.

Looking at the drawing itself (exhibit 1–B), Mr. Yost stated, on direct examination, that he could not say what the housing specified in the drawing was for; that it might be used in several different items of apparatus, and that he could not state, based on his experience, that its only use was for a lightning arrester. Without any further knowledge than just looking at exhibit 2, Mr. Yost said, "I think it is a high voltage procelain housing used in some type of apparatus." He could not say what apparatus "because electrical insulating housing for several different pieces of apparatus used in the high voltage power are [sic] very much the same; they differ only in minor dimensional characteristics." He stated that it might be the housing for a coupling capacitor, air blast breaker, pot head, cable terminal, or lightning arrester, and could be used as an electrical insulator. Mr. Yost explained that, in a general sense, exhibit 2 is an electrical insulator; but that, in the specific sense of electrical insulators as products that are usable, an electrical insulator requires "end fittings, in order to mount it to the ground or to the base, and to mount the conductor to the top." Mr. Yost further stated that of all the things he testified exhibit 2 "would be a likely use for * * * *I think this* [exhibit 2] *would be an unlikely use for an insulator.*" [Emphasis ours.] A porcelain housing, Mr. Yost said, is used in a lightning arrester "for the same reason that it is used in all other insulators, in a high voltage

system; porcelain is the best material * * * available to use as insulation at high voltage. In the lightning arrester we need a housing; that housing extends from the line end to the ground end of the arrester; therefore, it must have the same insulating integrity that any other insulating member of that same high voltage power system must have." [6] Asked to explain why exhibit 2 (housing) is suitable for use in high voltage electrical equipment other than lightning arresters, Mr. Yost replied that he was not sure he could answer the question and that "[i]n at least a negative sense, as a designer of lightning arresters for roughly 15 years" he knew of "nothing unique in the requirement of the housing of a lightning arrester as opposed to several other pieces of apparatus." He concluded his direct examination with testimony that his company used lightning arrester housings as housings for pot heads and had experimentally, in the laboratory, used the housings for coupling capacitors.

On cross-examination, Mr. Yost stated that "[i]f [he] * * * were given" exhibit 2, he could use it as a coupling capacitor housing, perfectly satisfactorily, although it might not be exactly the size he wanted. His company makes a lightning arrester competitive with the one General Electric makes, and has used its arrester housing, roughly of the same size and diameter as exhibit 2, for pot head housings. He further stated that such use was an exception, since his company, in normal course makes housings specifically for pot heads.[7] Asked, on cross-examination, to again examine the drawing and state his opinion of what it represented, Mr. Yost testified that:

> Up on the title block of this drawing, it says, "HV STATION LA (FORM 9L11L)." I have sufficient familiarity with General Electric catalogues, and with terminology, to know that that means this is intended to be a lightning arrested housing—as stated on the drawing.

Both sides have filed briefs. The first issue to determine is whether the imported ceramic housings are parts of lightning arresters as are dutiable under TSUS item 685.90. If the record does not *prima facie* establish that they are, as defendant argues, plaintiff must lose. If the housings are parts of lightning arresters, as plaintiff claims, there is the subsidiary issue of whether they are also ceramic electrical insulators, or other ceramic electrical ware, of the class or kind which defendant contends the headnote in schedule 6, part 5, *supra*, excludes from classification under TSUS 685.90. For reasons we shall discuss, we conclude that the imported ceramic housings are ceramic electrical

[6] Mr. Yost identified defendant's exhibit B as a type of lightning arrester which he installed in his home. Defendant's brief does not mention, and we fail to see, any connection between exhibit B and the imported ceramic housings in this case.
[7] A pot head, according to Mr. Yost, is a cable terminal, a high voltage cable terminal.

ware chiefly used as parts of lightning arresters; that they are not electrical insulators in the tariff sense; that they are relatively more specifically provided for as parts of lightning arresters than as ceramic electrical ware of the class or kind excluded from schedule 6, part 5, and sustain the protest.

The first point we dispose of is defendant's contention that plaintiff's claim that the imported ceramic housings are parts of lightning arresters must fail because there is no evidence in the record to support it. Defendant's brief asserts that the packing list with the official papers refers to "two model numbers of the merchandise imported", without any explanation of the difference in the models. However, as defendant has made no showing of any difference between the two models and as illustrative exhibit 2 was introduced without objection as an illustrative exhibit, defendant has no cause for complaint. Defendant goes on to argue that there is no evidence of the purpose and function of the ceramic housings in lightning arresters; that Mr. Saito was not qualified to testify as to the sole or chief use [8] of the ceramic housings, and that Mr. Okayama's testimony was limited to the theoretical suitability of the ceramic housings and not the actual use in the United States. If that was all there was to the record, defendant might have a case.

But the record we have summarized, in our opinion, makes a stronger case than defendant makes out. It is the strength of the evidence in the entire record, which we assess "in practical terms, considering such factors as completeness, adequacy of bases and possible motives to deceive", *Mannesmann-Meer, Inc.* v. *United States*, 58 CCPA 6, C.A.D. 995 (1970), that persuades us, *prima facie*, that the imported ceramic housings are parts of lightning arresters.

We have no reason to doubt that the purpose and function of a ceramic housing in a lightning arrester might have been more complete or might have been more clearly explained in the record. Minimally, we know from the record that a lightning arrester needs a housing and that the housing functions to insulate and protect internal elements. Defendant's own witness, Mr. Yost, explained that a high voltage lightning arrester needs a housing extending from the line end to the ground end, and that the ceramic housing of a lightning arrester maintains the insulating integrity that any member of a high voltage system must have. We also note that Mr. Yost did not refute Mr. Okayama's testimony that ceramic housings in lightning arresters protect the internal elements from the vagaries of weather,

---

[8] TSUS, General Headnotes and Rules of Interpretation 10, provides as follows:
 (ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

and that the housing is assembled with internal elements and metal fittings into a lightning arrester for the protection of high voltage systems against the effects of lightning. Mr. Yost testified to several different kinds of apparatus that exhibit 2, qualifiedly, *might be* used for. His qualification was that only in an exceptional case would a ceramic housing manufactured for a lightning arrester be used on some other kind of apparatus. However, a fugitive use or mere susceptibility or capability of use is not controlling as to the sole or chief use of imported merchandise.[9] It is also, in our opinion, reasonable to expect that Mr. Saito and Mr. Okayama would have every incentive to know the particular uses of the wares sold and manufactured by their respective companies.[10] Both testified, and Mr. Yost concurred, that just looking at the drawing (exhibit 1–B) they knew it was the housing for a General Electric lightning arrester.

Plaintiff, in our opinion having established that the imported ceramic housings were manufactured and imported for the General Electric Company lightning arresters, that lightning arresters need a housing, and that, in the normal course of business, ceramic housings manufactured to specifications for lightning arresters are solely or chiefly used for that purpose, we hold that the imported ceramic housings are parts of lightning arresters as plaintiff claims. Cf. *Arthur J. Humphreys et al.* v. *United States*, 59 Cust. Ct. 231, C.D. 3128, 272 F. Supp. 951 (1967), affirmed, *Id.* v. *Id.*, 56 CCPA 67, C.A.D. 956 (1969).

This brings us to defendant's second point that, even if the imported ceramic housings are parts of lightning arresters, they cannot be classified as parts of lightning arresters under TSUS item 685.90, because that item is in part 5 of schedule 6, *supra*, which states that it does not cover, *inter alia*, "electrical insulators * * * (classifiable in other schedules according to materials of which made)" and "ceramic electrical ware (part 2D of schedule 5)." The customs assessing item, "Other", TSUS item 535.14, is an inferior heading in part 2D of schedule 5, under a superior heading which classifies ceramic electrical insulators whether or not in part of metal, and other ceramic electrical ware. Whether customs assessed the imported ceramic housings as ceramic electrical insulators or more generally, as simply ceramic electrical ware, the record does not say. Defendant's brief states that customs assessed the ceramic housings at the duty rate specified in TSUS item 535.14 under the superior heading "ceramic electrical ware." Such a classification would appear to negate any contention that the imported ceramic housings are ceramic insula-

---

[9] *United States* v. *The Baltimore & Ohio R.R. Co. et al.*, 47 CCPA 1, 5, C.A.D. 719 (1959).
[10] *Id.* at 5.

tors. However, defendant goes on to state that the record establishes that the ceramic housings are "ceramic electrical ware", to wit, "ceramic electrical insulators." [11]

That ceramic housings for lightning arresters are "ceramic electrical insulators" in the tariff sense is less than clear from the record and our own research. Mr. Yost testified that in the general sense ceramic housings are electrical insulators, but that in the specific sense of usable products with "end fittings" for particular apparatus, he thought it unlikely the imported ceramic housing would be used as an insulator. Mr. Yost's reference to a "general sense", we take to mean in the sense that the ceramic housings are made of porcelain, which is the best material available to use as insulation at high voltage. In the "specific sense", we take it he was referring to a usable product. an insulator as such,[12] of which a lightning arrester is but one type.[13]

As plaintiff says, the superior tariff heading "ceramic electrical insulators * * * and other ceramic electrical ware" obviously distinguishes ceramic electrical insulators from other ceramic electrical ware in the general sense testified to by Mr. Yost. We are also hard put to conclude that a ceramic housing used in assembly of an insulator, i.e., such as a lightning arrester, can be the article itself, i.e. an insulator. Cf. *United States* v. *Baron Tube Co., et al.*, 47 CCPA 69, C.A.D. 730 (1960). On this record submitted by the parties, we are, therefore, inclined to view the imported ceramic housings for lightning arresters as "ceramic electrical ware" other than "ceramic electrical insulators" in the common and commercial meaning of the latter tariff term. We further conclude that they are relatively more specifically provided for as parts of lightning arresters than as ceramic electrical insulators or ceramic electrical ware.

The enigma generated by the schedule 6, part 5 headnote with reference to what it does not cover is that TSUS does not purport to define specifically what it intended to classify under the part 2D schedule 5 superior heading "ceramic electrical insulators" and "other ceramic

---

[11] It should be noted that the superior heading "other ceramic electrical ware" is apparently not as broadly inclusive of those articles as would appear. It "does not include ceramic wall plates for electrical switches, or electric lamp bases; such articles are chiefly used for ornamental purposes" and are in subpart C of part 2, schedule 5. Tariff Classification Study, schedule 5, TSUS item 535.14, page 95.

[12] See n. 1, *supra.*

[13] Lightning arresters of the expulsion or valve type (which as illustrated incorporate a porcelain housing substantially of the kind imported) "are normally insulators, but they become conductors of relatively low impedance during lightning current surges. They reestablish themselves as insulators after the lightning current has disappeared, and they will operate repeatedly." Electrical Engineer's Handbook, Pender-Del Mar, Fourth Edition, Electric Power, pages 12–36.

electrical ware",[14] not covered by schedule 6, part 5. Both sides have sought to resolve the enigma by resort to legislative history;[15] to the treatment of "parts of apparatus" in the Brussels Nomenclature heading 85.19 (comparable to TSUS item 685.90),[16] and argument postulating the classification of electrical articles (exhibit 5) not here in issue, and involved in certain rulings of the Bureau of Customs.[17] In our opinion, none of the materials cited on either side are decisive or even persuasive of the intent of Congress with respect to the classification of ceramic housings for lightning arresters. We would suggest that disputed classifications which are not definitively resolved by TSUS schedule and part headnotes may often be resolved in the relevant context of the TSUS General Headnotes and Rules of Interpretation.

For the purposes of TSUS, the relationships between the various schedules, parts and subparts and the classification descriptions incorporated therein (in this case schedule 5, part 2, subpart D, TSUS item 535.14 and schedule 6, part 5, TSUS item 685.90) are subject to the following TSUS General Interpretative Rules:[18]

> (a) the general, schedule, part, and subpart headnotes, and the provisions describing the classes of imported articles and specifying the rates of duty or other import restrictions to be imposed thereon are subject to the rules of interpretation set forth herein and to such other rules of statutory interpretation, not inconsistent therewith, as have been or may be developed under administrative or judicial rulings;
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> (c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but, in applying this rule of interpretation, the following considerations shall govern:
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> (ii) comparisons are to be made only between provisions of coordinate or equal status, i.e., between the primary or main superior headings of the schedules or between coordinate inferior headings which are subordinate to the same superior heading.

In this case, the narrow issue posed by the above rule of relative specificity is which of the superior headings, viz, "ceramic electric insulators" and "other ceramic electrical ware" or "lightning arrest-

---

[14] See Explanatory Notes to the Brussels Nomenclature, 1955, Vol. III, heading 85.25 and 85.26; Standard Industrial Classification Manual, Major Group 32, Industry No. 3264 (Porcelain electrical supplies), page 89, and Major Group 36, Industry No. 3643 (Current carrying wiring devices), and Industry No. 3644 (Noncurrent carrying wiring devices), page 109, both of which "exerted the greatest influence on the arrangement of the proposed revised [TSUS] scheules." Tariff Classification Study, Submitting Report, page 8.

[15] Tariff Classification Study, op. cit., n. 11.

[16] Defendant's brief, page 20.

[17] Plaintiff's brief, pages 13, 16, 17, 18 with attached Bureau rulings.

[18] TSUS, General Headnotes and Rules of Interpretation 10.

ers * * * and parts thereof" is more specific as to the imported ceramic housings. Judicial precedent, not inconsistent with rule 10(c), *supra*, has established the rule "that the more specific provision is the one having requirements which are more difficult to satisfy. *United States, etc.* v. *Simon, Saw & Steel Company, supra* [51 CCPA 33, C.A.D. 834 (1964)]. Also, the appellate court in *United States* v. *Astra Trading Corp.*, 44 CCPA 8, C.A.D. 627, reaffirmed the well-established principle that an *eo nomine* designation is preferred to terms of general descriptions and to enumerations which are broader in scope." *Arthur J. Humphreys, et al.* v. *United States, supra* (59 Cust. Ct., at page 238).

We are of the opinion that in applying the rule of relative specificity, the tariff terms "ceramic electrical insulators" and "ceramic electrical ware" are not specific classifications but generic classifications. Cf. *United States* v. *Andrew Fisher Cycle Co., Inc.*, 57 CCPA 102, C.A.D. 986 (1970). The provision for lightning arresters, on the other hand, is a specific *eo nomine* provision, and the provision for parts thereof requires that the part be solely or chiefly used with lightning arresters.[19] Since we view the record to establish that the imported ceramic housings meet the test for classification as parts of lightning arresters *eo nomine* provided for, which provision, in the context discussed here, is more difficult to satisfy than is the provision for "ceramic electrical insulators" and "other ceramic electrical ware", plaintiff's claim under TSUS 685.90 is sustained. Cf. *Arthur J. Humphreys, et al.* v. *United States, supra*.

Judgment will be entered accordingly.