**SANDVIK STEEL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**C.D. 4161; Protest No. 68/15586-5469-68.**

United States Customs Court,
Second Division.

Jan. 12, 1971.

Rode & Qualey, New York City (John S. Rode, New York City, of counsel), for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen., Frederick Ikenson, Trial Attorney, New York City, for defendant.

Before RAO, Chief Judge, and FORD and NEWMAN, JJ.

NEWMAN, Judge:

This protest concerns the proper rate of duty on certain merchandise describ-

ed on the invoices as "Shoe Die Knife Steel" and "Dieflex Cutting Rule." The merchandise was imported from Sweden in 1967, and was assessed with duty at the rate of 19 per centum ad valorem under the provision in item 657.20 of the Tariff Schedules of the United States (TSUS) for "Other" articles of iron or steel, not coated or plated with precious metal.

Plaintiff claims that the cutting rules are properly dutiable at the rate of 10 per centum ad valorem under item 649.67, TSUS, as "Other" knives and cutting blades for power or hand machines. The shoe die knife steel is, assertedly, entitled to entry free of duty pursuant to item 649.65, TSUS as amended by the Tariff Schedules Technical Amendments Act of 1965, P.L. 89-241, § 45(a), 79 Stat. 933, which covers knives and cutting blades for shoe machinery. Alternatively, plaintiff claims that the shoe die knife steel is classifiable under item 649.67, TSUS, *supra.*

We overrule the protest for the reasons discussed.

STATUTES INVOLVED

*Classified under:*

Schedule 6, Part 3, Subpart G, TSUS: —Metal Products Not Specially Provided For.

*Subpart G headnotes:*

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\* \* \* \* \* \*

Articles of iron or steel, not coated or plated with precious metal:

\* \* \* \* \* \*

Other articles:

\* \* \* \* \* \*

657.20          Other........19% ad val.

*Claimed under:*

GENERAL HEADNOTES AND RULES OF INTERPRETATION

10. *General Interpretative Rules.* For the purposes of these schedules—

* * * * * *

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not *finished*; [Emphasis added.]

* * * * * *

Schedule 6, Part 3, Subpart E.—Tools, Cutlery, Forks and Spoons.

Knives and cutting blades for power or hand machines:

649.65 [1]  For agricultural or horticultural machines (except lawnmower blades) and for shoe machinery . . . . . . Free

649.67  Other . . . . . . . . . . 10% ad val.

## THE RECORD

The record, consisting of the testimony of one witness, Darrel Dean Biegert,[2] nine exhibits and the official papers, all introduced in evidence by plaintiff, establishes:

The involved merchandise comprises two items: shoe die knife steel and Dieflex cutting rules. Both items are especially hardened and ground steel strips with a specially processed cutting edge.

### Shoe die knife steel

The shoe die knife steel, 0.750 inch in height and 0.082 inch in thickness, was imported in coils of continuous length, 150 to 200 feet. It was sold by plaintiff in the imported lengths primarily to shoe manufacturers and to commercial die shops serving the shoe manufacturing industry.

Shoe die knife steel is used for making dies known as "clicker" dies.[3] Such dies are used to cut pieces of material to certain patterns like sock linings for shoes or other shapes. Originally, shoe die knife steel was used entirely by the shoe industry, but by reason of new methods for making dies, the knife steel has acquired additional industrial applications. Hence, the percentage of use by the shoe industry has decreased.[4] Users of shoe die knife steel, other than the shoe industry, include manufacturers of handbags, novelties, labels, small clothing parts and commercial die shops.

It appears that shoe die knife steel is manufactured into dies by cutting pieces from the long coils to shorter lengths (1/8 inch to 10 feet), bending the pieces in a machine to the desired pattern or configuration, and securing the shape of the bent pieces by welding them with braces or screwing them into a board base. The imported knife steel is used to make dies "of an unending variety of shapes and sizes."

One-eighth inch lengths of knife steel are used as a "chisel" in the die, the function of which was explained as follows (R.49):

A chisel in a die is welded to the perimeter of the die to make a small cut in the leather or the other material perpendicular to the edge of the pattern. It is used to permit shaping or folding of the material at that point.

The clicker dies are used in a clicker press, which Biegert described (R.16):

It [clicker press] is a piece of power equipment, it is mechanical or hydraulic, that has quick release so that you put the material on the table of the machine, put your die on that, you release the top of the press, it presses the die through the material.

---

1.  As amended by P.L. 89–241, § 45(a).

2.  Mr. Biegert was employed by plaintiff as Assistant Division Manager and Sales Manager for Industrial Products.

3.  Hence, shoe die knife steel is also known in the trade as "clicker die steel" (R. 24).

4.  Biegert testified that on a percentage basis, use of the knife steel by shoe manufacturers "exceed[ed] 80 percent, possibly 90 percent" at the time of trial, October 17, 1969, and was a higher percentage at the time of importation, July 18, 1967.

*Dieflex cutting rules*

The involved cutting rules were imported and sold in 3-foot lengths, and were 0.923 inch in height.[5] Some other cutting rules were also imported in coils. Like the shoe die knife steel, a cutting rule is used to make dies. These dies are utilized on machines for cutting such materials as paper, vinyl plastics and cloth, and are used primarily in the packaging industry to cut paperboard for cartons.

In manufacturing cutting rule dies, the desired die pattern is cut in plywood with a jigsaw. Thereupon, the cutting rule is: cut to the length required for the particular pattern, bent to conform to the pattern cut in the plywood, and inserted into the cuts made in the plywood. A piece of rubber is glued to the face of the plywood to act as an ejector, so that the material being cut will not remain in the die.

## CONTENTIONS OF THE PARTIES

Plaintiff argues that the merchandise is "unfinished" within the purview of General Interpretative Rule 10(h), quoted *ante*. Accordingly, plaintiff claims that the merchandise consists of "unfinished" knives or cutting blades for power or hand machines.

Defendant, on the other hand, disputes that the merchandise is "unfinished" knives or blades. Thus, defendant argues that the merchandise is a mere material inasmuch as it must be cut into proper lengths and bent to the shape desired by the ultimate user; and moreover, the merchandise has no lines of demarcation at which the material is to be cut, bent or folded. In consequence, the Government insists that the merchandise is a material, because it has not been dedicated to the making of any particular knife or cutting blade for a power or hand machine, and that the identity of the individual articles is not "fixed with certainty."

## "MATERIALS" vs. "UNFINISHED"—CASES

We agree with the Government's position as we have stated it. The appellate court's reasoning in a line of cases is persuasive that the involved merchandise is a "material" as urged by defendant, rather than "unfinished" knives or blades as claimed by plaintiff: United States v. Harding Co., 21 CCPA 307, T.D. 46830 (1933); Harding Co. et al. v. United States, 23 CCPA 250, T.D. 48109 (1936); American Import Co. v. United States, 26 CCPA 72, T.D. 49612 (1938).

In the first *Harding* case, so-called brake linings imported in bales of running lengths, were held to have been properly classified by the collector as manufactures of asbestos yarn, rather than as parts of automobiles, finished or unfinished, as claimed by the importer. The court found that the merchandise was intended for use as linings for automobile brake shoes by the cutting to a proper length and by the drilling of holes corresponding to the holes on the brake shoe; but nonetheless, that the merchandise was commercially capable of various other uses. Under these circumstances, the appellate court agreed with the Government's contention that the merchandise was a "mere material" out of which brake linings could be made, and observed:

> * * * [I]t is not marked to indicate where it is to be cut, for the obvious reason that, even when used as brake linings for automobiles, it must be used in various lengths; accordingly, the identity of the individual articles is not fixed with certainty. [21 CCPA at 310.]

Although in the first *Harding* case the appellate court found that the merchandise was "commercially capable" of vari-

---

5. Plaintiff's witness was unable to specify the thickness of the Dieflex cutting rule, although he stated that such rule was made in standard thicknesses, referred to as "points," most commonly two points (0.028 inch) and three points (0.042 inch).

**1034**

ous uses, the court observed, in what it later characterized as "obiter dictum":[6]

> \* \* \* But, even if it could be said to be directed to the exclusive use of making brake linings for automobiles, it would be, nevertheless, a mere material for such use just as silk cloth in the piece, designed to be used as linings for clothing, is a mere material out of which such linings are to be cut. [Id. at 310.]

In the second *Harding* case, the record established that merchandise identical to that in the earlier case was used exclusively in the manufacture of brake linings for automobiles and was commercially unsuitable for other uses. Notwithstanding the exclusivity of use of the merchandise for automobile brake linings, the appellate court adhered to the opinion that the merchandise was a material, reasoning (23 CCPA at 252):

> As long as the merchandise is not cut before importation or is not marked when imported so that nothing remains to be done to make it an automobile brake lining except to cut it into pieces of predetermined length, we regard it as wholly immaterial that the cutting of the roll is delayed until it is fixed to and riveted upon the brake shoe. In the condition as imported, the long roll of brake-lining material has in no manner been dedicated to the making of any particular brake lining. To be a part of an automobile, that is a brake lining, it must be more than mere material for making a brake lining.

Similarly, in American Import Co. v. United States, 26 CCPA 72, T.D. 49612 (1938), 60-foot lengths of silk fishing leader gut were held classifiable as manufactures of silk rather than as unfinished leaders, notwithstanding that the chief, if not exclusive use of the material was the making of fishing leaders. That holding by the appellate court rested upon the above-quoted dictum of the first *Harding* case, and the following additional observations (26 CCPA at 74–75):

> It has long been the generally accepted rule that a thing may be classified for tariff duty purposes under the *eo nomine* provision for the article unfinished if that thing has been so far processed towards its ultimate completed form as to be dedicated to the making of that article or that class or articles alone. \* \* . \*

> It is the position of the appellant that from the raw material silk, these coils of so-called silk gut have been so far processed toward the ultimate article, leaders, as to be chiefly, if not exclusively, used as such and that since everything has been done except to finish the leaders, they must be regarded for tariff purposes as unfinished leaders.

> The question presented is a perplexing one, the solution of which necessarily results in a somewhat anomalous situation. It can not logically be denied that the imported article in 60-foot lengths is material for making leaders. All the witnesses agree that the only thing to be done to make the finished leader is to cut the material to length and, after soaking to soften the same, tie the loops. From the foregoing statement, it is obvious that if the imported coils were cut to length suitable for making different lengths of leaders, they would be more nearly finished than as imported, and if in addition to cutting the same to lengths, one of the loops was tied, they would be nearer finished than as imported.

> \* \* \* \* \* \*
> \* \* \* The mere fact that the instant merchandise is chiefly used, or for that matter exclusively used for leaders (and if it has any other use it is a fugitive one), does not take it out of the "material" class. Hundreds of articles might be suggested which are in the nature of material and which have found but one use. The mere

6. American Import Co. v. United States, 26 CCPA 72, 75, T.D. 49612 (1938).

fact that a thing has but one use does not require that it be considered as an article unfinished. * * *

In support of its claims, plaintiff relies heavily on Nyman & Schultz v. United States, 14 Ct.Cust.Appls. 432, T.D. 42060 (1927), and J. E. Bernard & Co., Inc. v. United States, 50 Cust.Ct. 41, C.D. 2386 (1963).

In *Nyman,* the imported merchandise consisted of thin strips of steel, an inch wide, in rolls of 10 or 12 pounds, tempered, highly polished, and punched at intervals with a series of three holes to fit the posts of safety razors. After importation, the strips were broken into pieces approximately the size of finished razor blades at the wide spaces between the series of three holes. A cutting edge was made on the pieces, and through additional processes of grinding, honing and stropping, the blades were finished for use with safety razors.

There was no dispute between the parties in *Nyman* that the merchandise constituted unfinished blades, and the sole issue was whether such blades were for safety razors. In concluding that the merchandise had been properly classified as unfinished blades for safety razors, the appellate court found that the width, thickness, temper, polish, and especially the particular kind of perforations, all dedicated the merchandise to a single use as safety razor blades.

In *Bernard,* steel bands or strips imported in coils of 100 and 500 feet, with saw teeth cut into the metal which were tempered and polished, were held properly dutiable under the provision for steel bandsaws, finished or further advanced than tempered and polished as claimed by the importer, rather than under the provision for manufactures of steel, n. s. p. f., as classified by the collector.

The court found (50 Cust.Ct. at 50): "[a]ll that remains to be done in this country to prepare the merchandise for its ultimate use is to cut and weld the bandsaw to the length desired for the particular machine with which it is to be used"; and that at the time of importation "the character and identity of the article as a steel bandsaw, further advanced than tempered and polished was * * * 'fixed with certainty.'" (*id.* at 46.)

In *Bernard,* the court distinguished the first *Harding* case on the basis that the brake lining material was commercially capable of uses other than automobiles, whereas the merchandise in *Bernard* was not commercially capable of any other use than as a bandsaw. However, the second *Harding* case was not discussed in *Bernard.*

In our view, the *Nyman* and *Bernard* decisions are not controlling in the present case.

In *Nyman,* the strips of steel were classified as unfinished blades for safety razors, and the importer did not dispute that the strips were unfinished blades. The appellate court, therefore, focused its discussion on the question of whether the unfinished blades were *for safety razors.* Moreover, in *Nyman,* the intended places for cutting the strips to make individual finished blades was apparent from the spacing and nature of the perforations running down the center of the strips, and hence the identity of the *individual* unfinished blades was not in question. Significantly too, the strips of steel in *Nyman* were "made * * * to possess the shape, size, and all of the necessary characteristics of unfinished blades for safety razors * * *."

Clearly, the instant merchandise does not possess the "shape, size, and all of the necessary characteristics" of unfinished blades for power or hand machines. At the time of importation, the shape and size of the finished dies made from the shoe die knife steel and cutting rules are entirely indeterminate, inasmuch as there are no designated or intended places for cutting or bending the imported material. In that respect, the knife steel and cutting rules are analogous to the long lengths of so-called brake lining and silk fishing leader gut held to be "mere materials" in the two

**1036**

*Harding* and the *American Import* cases.

The issue, in *Bernard,* was whether the merchandise was bandsaws "finished or further advanced than tempered or polished." The evidence showed that the merchandise was ·tempered and polished, and was known interchangeably as bandsaw or bandsaw blade. The court noted also that certain bandsaw machines could use the 100-foot imported lengths. In light of the foregoing significant factors together with the reasoning applied by the appellate court in the second *Harding* and the *American Import* decisions, we do not feel that *Bernard* is controlling as respects the present issue.

Upon full consideration of the decisions discussed herein and the arguments presented by both parties, we have concluded that the shoe die knife steel and Dieflex cutting rules are materials for making cutting dies, rather than unfinished knives or cutting blades for power or hand machines.

The protest is overruled, and judgment will be issued accordingly.