(C.D. 4294)

NAFTONE, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided November 11, 1971)

*Sharretts, Paley, Carter & Blauvelt* (*Gail T. Cumins* and *Louis Schneider* of counsel) for the plaintiff.

---

*L. Patrick Gray III*, Assistant Attorney General (*Herbert P. Larsen*, trial attorney), for the defendant.

Before WATSON and MALETZ, Judges, and ROSENSTEIN, Senior Judge; MALETZ, J., concurring

ROSENSTEIN, Judge: The merchandise at bar consists of rolls of "Makrofol KG" (MKG), a polycarbonate film imported from West Germany in 1967 in two sizes: 5 micron (0.005 millimeters) thick, 381 millimeters wide and 29,000 meters long, and 12 micron (0.012 millimeters) thick, 314 millimeters wide, and 31,000 meters long.[1] The shipment was assessed for duty under TSUS item 774.60, as "Articles, not specially provided for, of rubber or plastics: * * * Other", at 17 per centum ad valorem, the rate in effect at the time of importation, and is claimed properly dutiable under TSUS item 773.30 as "Electrical insulators, of rubber or plastics", at 10 per centum ad valorem.

At the trial five witnesses were called by plaintiff and one by defendant.

It appears from the record that MKG is made from a solution of polycarbonate resin to which solvents have been added in order to effect the crystallization, or orientation of the molecules. The solution is cast on specially designed drums, dried, and wound. The film is then stretched lengthwise and slit to the desired length. The stretching and casting process for MKG film is patented by Farbenfabricken Bayer, West Germany.

The crystallization and stretching increase the tensile strength of the film and impart to it excellent insulating, or dielectric, properties. Its high dielectric strength makes it suitable for use as a "capacitor dielectric" (R. 42), that is, "as an insulator in the capacitors to separate the electrodes" (R. 42). A capacitor, essentially, is a device for storing electrical energy. The only commercial use at the present for MKG film is as a dielectric, or insulator, in capacitors, although if it were more competitive in price, it might have other applications as an electrical insulator.

Dr. Eckart Reese, a chemist in charge of the production, development and control of MKG for Bayer, testified:

Q. What are the properties, if any, of Makrofol KG?—A. The properties of Makrofol KG are high dielectric strength, low dissipation factors even at high temperatures, resistance against the deterioration by high voltage.

Q. Dr. Reese, when you use the words "high dielectric strength" would you please explain for us what you meant?—A. High dielectric strength means that Makrofol KG is an insulator at high voltages.

[1] It is not disputed that the rolls are under 15 inches in width and thereby excluded from classification as "sheets" of rubber or plastics by virtue of schedule 7, part 12, subpart B headnote 2, as amended by P.L. 89–241, 79 Stat. 949 (R. 4–5).

Q. What do you mean by the term "insulator"?—A. It prevents the current from flowing from one electrode to another. [R. 8–9.]

\* \* \* \* \* \* \*

Q. How is Makrofol KG used in the United States, from your investigation?—A. It is used as a dielectric for capacitors.

Q. What do you mean by the term "dielectric"?—A. It's the same like an insulator.

Q. Do you know of any use for Makrofol KG other than as a dielectric or an insulator?—A. No. [R. 14.]

Helmut O. E. Kluefer, product manager for plaintiff-importer, testified that MKG is used "as an insulator to manufacture capacitors" (R. 24).

Haim Beyer, electrical engineer and former chairman of the board, now consultant, to Cornell Dubilier, an electronics firm which manufactures capacitors using MKG film in widths ranging up to six inches,[2] testified:

Q. Mr. Beyer, what function does Makrofol play, if any, in Plaintiff's Exhibits 3–A [unfinished capacitor] and 3–B [finished capacitor]?—A. As an insulator or dielectric.

Q. When you use the words "insulator or dielectric" what do you mean?—A. I mean that it does not conduct electricity.

Q. Does Makrofol possess any particular properties that cause you to use it in the manufacture of your capacitors?—A. Yes.

Q. What are these properties?—A. Well, it has extremely stable characteristics with respect to variation in dielectric constant with temperature, very high insulation resistance, high resistance to moisture, and I guess that's about the major parts. It's got high dielectric strength, too. [R. 32–33.]

\* \* \* \* \* \* \*

[cross-examination]

Q. When you say "an insulator in a capacitor" you mean this is a component of the capacitor?—A. Well, you might say that it's a dielectric of the capacitor, that's the insulator.

Q. This is the only use that you have for Makrofol KG?—A. That's right. [R. 38.]

Louis Kahn, a consultant engineer in the field of electrical and electronic devices and materials, professor of electrical engineering at Cooper Union, New York City, and consulting member to ASTM for dielectric materials, who, during his prior employment with companies manufacturing capacitors and electronic components, had "investigated MKG as a capacitor dielectric" testified:

Q. Just talking about the test performed on Makrofol KG itself, what were the results, if any, of your investigations?—

---

[2] Collective exhibits 3–A and 3–B, unfinished and finished capacitors manufactured by Cornell Dubilier, are approximately one and three quarters and one and one quarter inches in length, respectively, and five-eighths of an inch in diameter.

A. Well, the results were that the material had excellent properties for use as a capacitor dielectric.

Q. When you use the term "capacitor dielectric" what do you mean?—A. I mean as an insulator in the capacitors to separate the electrodes.

Q. What were these properties of which you have just spoken?—A. Well, the properties in which we were interested were first dielectric constant, dielectric strength, dissipation factor, the effects of temperature, voltage, and time and humidity on these properties, and also the physical properties of the material such as tensile strength, shrinkage, thickness, and many others that are necessary in the use of an insulator in capacitors.

Q. Are there any particular requirements with respect to the selection of the insulators in a capacitor?—A. Yes; there are many requirements that are special. In selecting a dielectric for a capacitor the first thing that must be taken into account is the particular application or the requirements of the capacitor, and these are very broad, cover a very, very wide range. And since the major properties of the capacitor are controlled or determined by the dielectric, the selection of dielectrics must take all of these factors into account. * * * [R. 42–43.]

\* \* \* \* \* \* \*

[cross-examination]

Q. Would you make any distinction between a dielectric material and an insulator?—A. No. It depends entirely—whatever distinction is made depends entirely on its application rather than on the basic properties of the materials or the device.[3] [R. 49.]

Exhibit 2, a brochure put out by Farbenfabriken Bayer, describes its "electrical insulating films which are based on polycarbonate, and are sold under our Registered Trade Mark Makrofol" and lists the films' various specifications and uses in insulating applications. MKG, according to the pamphlet, is used in "Capacitors (of vacuum-metallized film or with aluminum foil), conductor and coil insulation, slot layer material".

Plaintiff contends that the subject merchandise is designed, dedicated to and used exclusively as an electrical insulator; that it comes within the common meaning and commercial understanding of that term; and that, regardless of whether the instant film be considered

---

[3] The witnesses generally used the terms "insulator" and "dielectric" interchangeably; the latter is commonly used with reference to capacitors in lexicographic, encyclopedic and other reference materials:

"Insulators used primarily as media for the storage of electrostatic energy, for example, in capacitors, are called dielectrics." *McGraw-Hill Encyclopedia of Science and Technology*, 1960, Vol. 7, p. 162.

"Dielectric. The insulating material between the plates of a capacitor; a material through which electrical attraction or repulsion can be sustained." *Modern Science Dictionary*, Hechtlinger, 1959.

"Electrical capacitors (or condensers) consist in principle of two conducting surfaces separated by an insulating material (dielectric), e.g., air, paper, mica, oil, resins, ceramics or glass." *Brussels Nomenclature*, Explanatory Notes, Heading 85.18, Vol. III, p. 957.

a "material" or an "article" or "device" made of electrical insulating material, it is properly classifiable under item 773.30.

Defendant asserts that the MKG at bar is simply a "poor conductor of electricity" rather than an "electrical insulator"; that, at best, it is mere "material"; and that it is precluded from classification under the claimed item which embraces only "articles" or products made of insulating materials.

We find, on the record herein, that the subject merchandise, by virtue of its design, properties and applications, is electrical insulating film. The record fails to show, however, that the film, which was imported in rolls 29,000 and 31,000 meters long, and must be cut into appropriate sizes before being used in insulating applications (as in exhibits 3–A and 3–B herein), is more than electrical insulating material or consists of articles, finished or unfinished, made therefrom.

In *American Import Co.* v. *United States*, 26 CCPA 72, T.D. 49612 (1938), 60-foot lengths of silk fishing leader gut were held classifiable as manufactures of silk rather than as unfinished leaders notwithstanding that the chief, if not exclusive use of the material was in the manufacture of fish leaders. The court stated (26 CCPA at 74–75) :

> It has long been the generally accepted rule that a thing may be classified for tariff duty purposes under the *eo nomine* provision for the article unfinished if that thing has been so far processed towards its ultimate completed form as to be dedicated to the making of that article or that class of articles alone. * * *
>
> It is the position of the appellant that from the raw material silk, these coils of so-called silk gut have been so far processed toward the ultimate article, leaders, as to be chiefly, if not exclusively, used as such and that since everything has been done except to finish the leaders, they must be regarded for tariff purposes as unfinished leaders.
>
> The question presented is a perplexing one, the solution of which necessarily results in a somewhat anomalous situation. It cannot logically be denied that the imported article in 60-foot lengths is material for making leaders. All the witnesses agree that the only thing to be done to make the finished leader is to cut the material to length and, after soaking to soften the same, tie the loops. From the foregoing statement, it is obvious that if the imported coils were cut to length suitable for making different lengths of leaders, they would be more nearly finished than as imported, and if in addition to cutting the same to lengths, one of the loops was tied, they would be nearer finishe than as imported.
>
> \* \* \* \* \* \* \*
>
> * * * The mere fact that the instant merchandise is chiefly used, or for that matter exclusively used for leaders (and if it has any other use it is a fugitive one), does not take it out of the "material" class. Hundreds of articles might be suggested which

are in the nature of material and which have found but one use. The mere fact that a thing has but one use does not require that it be considered as an article unfinished. * * *

See also *The Harding Co. et al.* v. *United States*, 23 CCPA 250, T.D. 48109 (1936) ; *United States* v. *The Harding Co.*, 21 CCPA 307, T.D. 46830 (1933) ; *Sandvik Steel, Inc.* v. *United States*, 66 Cust. Ct. 12, C.D. 4161, 321 F. Supp. 1031 (1971) ; *F. H. Paul & Stein Bros., Inc.* v. *United States*, 44 Cust. Ct. 130, C.D. 2166 (1960).

On the authority of the foregoing cases, we find that the involved merchandise is electrical insulating material.

The question before us now is whether the plastic electrical insulating material herein is an "electric insulator" within the ambit of item 773.30. We find that it is not.

Plaintiff contends that the MKG herein is an "article" for purposes of item 773.30 and stresses that the merchandise was classified as "Articles not specially provided for, of rubber or plastics". However, there is no one meaning to be assigned to the term "article". *C. J. Tower & Sons of Buffalo, Inc.*, 63 Cust. Ct. 128, C.D. 3886 (1969). In *D. N. & E. Walter & Co., et al.* v. *United States*, 44 CCPA 144, 147, C.A.D. 652 (1957), the court stated:

> In the *Eimer & Amend* case [28 CCPA 10, C.A.D. 117 (1940)] cited by the Customs Court, this court had occasion to point out that the word "articles" is used hundreds of times in most tariff statutes; that Congress clearly meant it to have a broad meaning in some provisions and a restricted meaning in others; and that *it has meanings varying with the purposes to be accomplished.* * * * [Emphasis copied.]

Our study of the Tariff Schedules and the supplemental materials relating thereto persuades us that the provision for electric insulators of rubber or plastics is applicable to such articles or devices as are insulators and not to the electrical insulating material from which they are made.

The distinction between insulators and insulating materials is to be found in the Tariff Schedules, schedule 6, part 5, headnote 1, which provides:

> 1. This part does not cover—
> (i) electrical insulators or insulating materials (classifiable in other schedules according to materials of which made) ;

In accordance with the cited headnote, electrical insulators of ceramics and glass are separately provided for, as follows:

Schedule 5, Part 2, Subpart D :

Subpart D headnote :

> 1. Nonceramic materials used merely for supporting, joining, or reinforcing purposes in chemical

ware provided for in this subpart shall be disregarded in determining the component material of chief value in such articles.

Ceramic magnets, ceramic electrical insulators whether or not in part of metal, and other ceramic electrical ware, including ferroelectric and piezoelectric ceramic elements:

535.11 Porcelain insulators, with metal parts cemented thereto and comprising not less than 30 percent of the weight thereof, used in high-voltage, low-frequency electrical systems_____ * * *

Schedule 5, Part 3, Subpart C:

Glass electric insulators with or without fittings:
547.41 With metal fittings_____ * * *
547.43 Without metal fittings_____ * * *

Although there may be some ambiguity with respect to the merchandise covered by item 773.30, it is clear, from their context and from the relevant Explanatory Notes to the *Tariff Classification Study*, November 15, 1960, Schedule 5, pages 95 [4] and 145,[5] that items 535.11, 547.41 and 547.43 provide for insulating articles or devices, not their component materials.

Statutes which relate to the same subject matter or have the same purpose or object are *in pari materia* and are to be construed together. *Judson-Sheldon Corp.* v. *United States*, 22 Cust. Ct. 111, C.D. 1168 (1949), affirmed *United States* v. *Judson-Sheldon Corp.*, 37 CCPA 89, C.A.D. 424 (1950).

It is highly unlikely, in the absence of express contrary intent, that Congress, which had the tariff classification schedules revised in order to achieve logic in arrangement and terminology, and to eliminate anomalies and illogical results,[6] would assign a different meaning to the same terminology appearing twice or more in the classification schedules. Accordingly, we find an intent to provide in item 773.30 for

---

[4] "Subpart D embraces certain important classes of industrial ceramics. Items 535.11 and 535.14 embrace ceramic electrical articles, covered by items 534.21 (ceramic magnets) and 534.25 (other) in the draft published for the hearing. These provisions have been completely revised as a result of information received at and subsequent to the hearing. It was learned that significant imports of large porcelain insulators are being classified as articles in chief value of metal in paragraph 353 of the tariff act at a rate of 15 percent ad valorem. In line with the general effort to avoid, whenever possible, the classification uncertainties incident to the 'chief value' concept, information was obtained from the importer of such insulators and from U.S. producers of similar insulators, on which to base an objective description of the insulators being imported under paragraph 353. The description in item 535.11 was developed from such information * * *" And see *Mitsubishi International Corp.* v. *United States*, 66 Cust. Ct. 413, C.D. 4227 (1971), appeal pending, regarding ceramic electrical insulators.

[5] "Item 547.41—Glass insulators are usually pressed and are currently provided for under paragraph 230(d) as pressed articles. In order to stabilize the classification and to avoid the uncertainties of classification based on the component of chief value, the proposed provision covers electric insulators 'with or without fittings'."

[6] *Tariff Classification Study*, Submitting Report, p. 1.

plastic and rubber electric insulating articles exclusive of the materials of which they are composed.

Although it is not evidence of the legislative intent, we note that the Tariff Commission, in the *Summaries of Trade and Tariff Information*, 1968, Schedule 7, Volume 7, pages 133, 135, treats the "electric insulators" of the claimed provision as articles in the sense of devices, rather than materials:[7]

> This summary discusses gaskets and electric insulators, of rubber or plastics. * * * Electric insulators, also made in many shapes and sizes, are used to support charged conductors and to prevent them from contact with one another or from grounding.
>
> * * * * * * *
>
> * * * Both rubber and plastics are used extensively as materials for gaskets and electric insulators.
>
> * * * * * * *
>
> In 1965, * * * [o]ne hundred or so companies produced plastics insulators; about 50 manufactured insulators from rubber. Production, although widely distributed throughout the United States, tends to be concentrated in the industrial areas of the East North Central and Northeastern States. Although a few large rubber companies account for a sizable portion of total production, the majority of the producers are small companies. Most producers, however, manufacture numerous articles of rubber or plastics in addition to gaskets and insulators.

Based on the foregoing, we find and hold that the merchandise at bar was properly classified under TSUS item 774.60.

The protest is overruled. Judgment will issue accordingly.

MALETZ, Judge: I concur in the result.

(C.D. 4295)

---

[7] A similar distinction is also made in the *Explanatory Notes to the Brussels Nomenclature* (1955) under the heading "85.25—Insulators of Any Material" (Vol. III, p. 971) :

"Insulators of this heading are used for the fixing, supporting or guiding of electric current conductors while at the same time insulating them electrically from each other, rrom earth, etc. * * *

"Usually there is a relation between the size of the insulator and the voltage (large for high voltages, smaller for low voltages). Similarly, the shape of the various types of insulators is influenced by electric, thermic and mechanical considerations. * * *

"Insulators may be made of any insulating material, usually very hard and non-porous, e.g., ceramic material (porcelain, steatite), glass, fused basalt, hardened rubber, artificial plastic materials and compounded insulating materials. * * *"