(C.D. 4860)

Lee Enterprises, Inc., plaintiff, *v.* United States, defendant

Court No. 77–2–00176

(Decided June 23, 1980)

*Glad, Tuttle & White*, Esqs. (*Robert Glenn White*, Esq., of counsel) for the plaintiff.

*Alice Daniel*, Assistant Attorney General, *Joseph I. Liebman*, Attorney in Charge, Field Office for Customs Litigation, *Susan Handler-Menahem*, trial attorney, for the defendant.

NEWMAN, JUDGE:

### INTRODUCTION

Plaintiff contests the classification by Customs at Los Angeles of certain NAPP photopolymer plates imported from Japan during the period of 1972–74. The merchandise was classified by the District Director under the provisions in item 657.40, TSUS, as modified by T.D. 68–9, for articles of aluminum, not coated or plated with precious metal, and assessed duty at the rate of 9.5 per centum ad valorem. Plaintiff claims that the imports are unfinished printing plates, and are properly dutiable under the provision in item 668.50, TSUS, for "Other parts of printing machinery" at the rate of 6 per centum ad valorem, the rate applicable to printing presses under item 668.20, TSUS, as modified by T.D. 68–9.

I have concluded that plaintiff's claim should be sustained.

### STATUTES INVOLVED

Tariff Schedules of the United States, 19 U.S.C. § 1202:

*Classified under*:

Schedule 6, part 3, subpart G:
657.40     Articles of aluminum, not coated or
           plated with precious metal_____     9.5% ad val.

*Claimed under*:
　Schedule 6, part 4, subpart D:
　　Printing machinery:

| | | | |
|---|---|---|---|
| * | * * * * | * | * |
| 668.20 | Other, including printing presses, offset duplicating machines, and stencil copy machines_____ | 6% ad val. | |
| * | * * * * | * | * |
| 668.38 | Steel plates, stereotype plates, electrotype plates, half-tone plates, * * * and plates of other materials, engraved or otherwise prepared for printing_____ | | * * * |
| 668.50 | Other parts of printing machinery_____ | The rate for the articles of which they are parts. | |

　General headnotes and rules of interpretation:
　10. *General interpretative rules.*—For the purposes of these schedules—

　　* 　　* 　　* 　　* 　　* 　　* 　　*

　　(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;
　　(i)–(j) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

### THE RECORD

　Plaintiff presented the testimony of three witnesses: Gary L. Benshoof, director of product programs for NAPP Systems (U.S.A.), Inc. (an affiliate of Lee Enterprises, Inc.), and a former employee of plaintiff; Tom Williams, publisher of the Montana Standard, a Lee Enterprises newspaper; and James Michael Zehner, commodity team leader, U.S. Customs Service. Defendant called no witnesses. Both parties submitted various exhibits, and the official papers were received in evidence, without marking.

　The pertinent facts are:

　The merchandise comprises rectangular aluminum plates measuring 16 by 24 inches coated with a polyvinyl alcohol resin (photopolymer coating) which is sensitive to ultraviolet light (R. 14–15, 20). The NAPP plates are used for printing newspapers on rotary letter presses by various publishers in the United States, and have no use other than for printing (R. 18, 20–21, 72, 76). Letter press printing is a process in which an image is raised in relief and printing is performed from the raised top surface (R. 8).

　In their imported condition, the photopolymer plates are not usable

for printing, but require preparation. The plates are prepared for use in printing by first exposing a newspaper page negative onto their light-sensitive surface with an ultraviolet light. This exposure to light causes chemical changes (polymerization) that harden the photopolymer coating in those areas where the light is transmitted through the negative. After the exposure process, water is sprayed onto the plates washing away the photopolymer coating in the areas that were not exposed to the ultraviolet light, leaving a relief image on the plates (R. 21, 23–24, 26).

After the relief image has been placed on the plates, they must be prepared for mounting on the letterpresses. In short, such preparation involves trimming to size, punching holes, and bending the ends of the plates (R. 28, 48).

The purpose of trimming the plates is to reduce their size to the size of the page of printed image used by the particular newspaper. Newspapers are not printed in any standard or uniform sizes, and consequently the precise amount of trimming required for a particular plate depends upon the specific size of the newspaper to be printed with that plate (R. 61, 69–70). There are no lines of demarcation on the plates for trimming (R. 47).

After trimming, holes are punched in the ends of the plates, which holes serve the purpose of holding the plates to the saddle of the press cylinder by pins (R. 32, 40, 58). The saddle is a semicyclindrial device attached to the cylinder of the rotary letter press that acts as an adapter for photopolymer plates (R. 34–36).

After hole-punching, the ends of the plates are crimped or bent to a 90-degree angle (R. 28, 47).

It takes from 7 to 10 minutes to expose the imported plates and prepare them for mounting to the saddle of the press (R. 41, 75–76).

### THE ISSUE

The sole question presented is whether the trimming, hole-punching and crimping operations to which the imported plates were subjected in order to mount them on a letterpress constituted the processing of an unfinished printing plate into a finished plate, as contended by plaintiff; or whether such processing constituted the substantial manufacture of a raw material into a finished article, as maintained by defendant.[1]

### OPINION

Interpretative rule 10(h) of the Tariff Schedules of the United States provides in pertinent part that "unless the context requires

---

[1] Defendant does not urge that the exposure and washing process used to place a relief image on the photopolymer plates constituted the imports materials rather than unfinished plates. Further, defendant does not dispute that if the imports are unfinished printing plates, they are classifiable as parts of printing machinery under item 668.50, TSUS.

otherwise, a tariff description for an article covers such article, * * * whether finished or not finished". Hence, by virtue of rule 10(h), the provision for parts of printing machinery in item 668.50, TSUS, covers unfinished parts of such machinery. While plaintiff claims that the imports are unfinished printing plates (and thus, unfinished parts of printing machinery), defendant insists that the merchandise is in material form (brief, at 6).

In *Avins Industrial Products Co.* v. *United States*, 72 Cust. Ct. 43, C.D. 4503, 376 F. Supp. 879, *reh. denied*, 72 Cust. Ct. 147, C.D. 4522 (1974), *aff'd*, 62 CCPA 83, C.A.D. 1150, 515 F.2d 782 (1975), Judge Rao articulated the dedication to use test that is applicable in determining whether particular merchandise is a material or an unfinished article or part (72 Cust. Ct. at 49):

> The general rule is that a thing may be classed an as unfinished article if in its imported condition it has been so far advanced beyond the stage of materials as to be dedicated to and commerically fit for use as that article and is incapable of being made into more than one article or class of articles. *United States* v. *Schenkers, Inc., supra; American Import Co.* v. *United States*, 26 CCPA 72, 74, T.D. 49612 (1938); *F. W. Myers & Co., Inc.* v. *United States*, 57 CCPA 87, 90, C.A.D. 982, 425 F. 2d 781 (1970); *Finn Bros. Inc.* v. *United States*, 59 CCPA 72, 75–76, C.A.D. 1042, 454 F. 2d 1404 (1972).

And continuing, the Court observed (72 Cust. Ct. at 50):

> Whether particular merchandise is a material or an unfinished article or part is a question which has been before the courts on many occasions, with differing results depending upon the facts and the statutory language in each case. *United States (American Sponge & Chamois Co., Inc., Party in Interest)* v. *Nylonge Corporation*, 48 CCPA 55, 61, C.A.D. 764 (1960). "The exact point in the processing of raw material at which it becomes a partly finished article or manufacture is a matter which must be determined on the basis of the circumstances of the particular case involved." *J. B. Henriques, Inc.* v. *United States*, 46 CCPA 54, 56, C.A.D. 695 (1958).

It is also well settled that imported merchandise will be regarded as a material rather than as an unfinished article or part where the identity of the individual article is not fixed with certainty. See *Bendix Mouldings, Inc.* v. *United States*, 73 Cust. Ct. 204, C.D. 4576, 388 F. Supp. 1193 (1974), *Sandvik Steel, Inc.* v. *United States*, 66 Cust. Ct. 12, C.D. 4161, 321 F. Supp. 1031 (1971), and the cases cited and discussed therein. As stated by Judge Watson in *Bendix Mouldings* (73 Cust. Ct. at 205):

> The general problem of when a material becomes an article is one which has long been the subject of judicial consideration. I believe certain useful guidelines emerge from a study of past case law. With respect to importations which are in a form dedi-

cated to a certain use but from which the claimed individual articles have not yet fully emerged, to my mind the underlying question is whether the identity of an actual individual article can somehow be discerned.

Here, the record abundantly establishes that the NAPP plates in issue were dedicated to use as printing plates, and that the identity of the individual article was fixed with certainty. Thus, each individual imported NAPP plate was dedicated to use for no more than a single letter press printing plate and was not bulk material from which an unknown number of printing plates were made. This significant fact distinguishes the merchandise in the present case from that in the following line of cases holding the merchandise therein to be a material rather than unfinished articles or parts. *The Harding Co. et al.* v. *United States*, 23 CCPA 250, T.D. 48109 (1936) (brake linings in rolls); *American Import Co.* v. *United States*, 26 CCPA 72, T.D. 49612 (1938) (silk fishing-leader gut in coils); *F. H. Paul & Stein Bros., Inc.* v. *United States*, 44 Cust. Ct. 130, C.D. 2166 (1960) (reels of aluminum foil); *Sandvik Steel, Inc., supra* (shoe die knife steel in coils and Dieflex cutting rules in lengths); *Naftone, Inc.* v. *United States*, 67 Cust. Ct. 341, C.D. 4294 (1971) (rolls of plastic film); *Bendix Mouldings, Inc., supra* (wood moldings in 9-foot lengths dedicated for use in the manufacture of picture or mirror frames).

As may be noted, the merchandise in the above-cited cases was imported in rolls, coils, reels, or lengths rather than individual pieces which required trimming, as here. Notwithstanding the trimming required, the imported articles were still identifiable as individual printing plates in an unfinished condition. They were never cut in half (R. 60) or divided into several printing plates. In this respect, the present merchandise is somewhat analogous to the so-called natural silk gut or "tegusu" in *Geo. S. Bush & Co., Inc.* v. *United States*, 34 CCPA 17, C.A.D. 338 (1946).

In *Bush*, the natural silk gut was imported in individual pieces of from 5 to 7 feet in length. Before these pieces could be used as leaders for fishing lines, a waste portion thereof (clearly distinguishable from the usable portion of the articles) was required to be cut off. The articles from which the waste portions had been removed and which had been soaked in water and loops tied in each of the ends for the purpose of attaching a fishing line to one end and a hook to the other, were used without cutting to length as finished leaders. In finding that the individual pieces of natural silk gut were unfinished leaders rather than material, the Court of Customs and Patent Appeals commented (34 CCPA at 20):

> * * * We are of opinion, therefore, that each piece of the merchandise in question was dedicated to the making of a particular length of leader, which was not true in the *American Import Co.*

case, *supra*, and that * * * the involved articles have been so far advanced that each has attained an individuality which identifies it in its unfinished state as the article it will be when finished. * * *

It is true, as pointed out by defendant, the imports were not dedicated to any particular size printing plates. Nevertheless, I cannot agree with defendant that such fact precludes the imports from the status of unfinished articles. The overriding fact remains that each NAPP plate, after processing, was dedicated to use as a single printing plate and "the involved articles have been so far advanced that each has attained an individuality which identifies it in its unfinished state as the article it will be when finished". *Bush, supra*, 34 CCPA at 20. The trimming, hole-punching and bending operations, which were required after importation, were not substantial manufacturing processes. As previously mentioned, it requires a mere 7 to 10 minutes to expose a page negative to the imported plates and prepare the plates for mounting on a particular letterpress by trimming, punching, and bending.

At the trial, defendant introduced in evidence (exhibit A) a copy of a letter dated June 6, 1972, written by W. A. Walsmith (plaintiff's then production manager) to the District Director of Customs at Chicago, Ill. Walsmith's letter states, inter alia, that the NAPP plates were imported in material form. However, it is important to note that Walsmith's letter was sent in response to a written questionnaire (exhibit B) by the District Director at Chicago as to whether the NAPP plates are "a stock size ready to fit a specific type printing machine" or "are * * * imported in material form so that they must be cut to fit the press". It is evident from Customs' questionnaire and the response thereto that, in stating that NAPP plates were imported in material form, Walsmith simply adopted one of the two alternatives suggested by the District Director.[2] Significantly, the District Director did not suggest or inquire into the possiblity that NAPP plates were imported as unfinished articles. While Walsmith's letter admits that the NAPP plates required trimming (a fact not disputed by plaintiff), Walsmith's characterization of the NAPP plates as a material is not conclusive as to the legal issue in this case.

Plaintiff has directed attention to a recent decision by Judge Watson in *The Kinney Co.* v. *United States*, 83 Cust. Ct. 137, C.D. 4831 (1979). There, the issue was whether certain flat metal pieces subjected to processing after importation were classifiable as parts of jewelry or as articles of copper. The dispute revolved about whether the merchandise was unfinished or a material. In determining that the imports

---

[2] As to the other alternative suggested by the District Director, the NAPP plates clearly were not imported in stock sizes ready to fit a specific type printing machine.

were unfinished parts, the court did not discuss the additional proc-
essing required after importation to complete the articles, and the
linchpin of the court's decision is found in the following observation
(83 Cust. Ct. at 139):

> Plaintiff's argument that the importations are not sufficiently
> advanced to be parts is ingenuous. They are clearly much too
> developed in form and in detail and too close to the final product
> to be considered mere material. * * *

By the same token, here the NAPP plates are far too advanced
toward the ultimate product to be considered as mere material, and
consequently I find they are unfinished articles.

Finally, we reach the question of whether the unfinished printing
plates are parts of printing machinery, as claimed by plaintiff.

The record shows that the imported plates were designed for use in
rotary letterpresses. There is no dispute that letterpresses are classi-
fiable under item 668.20, TSUS (paragraph 10, complaint and answer),
and that letterpresses cannot function for the purposes for which they
were designed and intended without the use of printing plates (para-
graph 15, complaint and answer). Additionally, plaintiff's evidence
establishes without contravention that the imports were dedicated to
use as printing plates for printing machinery. According to the
Summaries of Trade and Tariff Information (1969), schedule 6,
volume 8, p. 277:

> The Bureau of Customs has also held that item 668.50 covers
> such articles as printing plates that have not been engraved or
> otherwise prepared for printing. * * *.

Plaintiff also cites *Crabtree Vickers, Inc.* v. *United States*, 79 Cust.
Ct. 13, C.D. 4707, *reh. denied*, 79 Cust. Ct. 60, C.D. 4714 (1977),
which involved the proper tariff classification of certain aluminum
plates coated with a photosensitive plastic used in printing machinery.
While interestingly, the plates in *Crabtree* were classified by Customs
as parts of printing machinery under item 668.50, TSUS (plaintiff's
claimed provision herein), the present issue was not before the court
in that case.

In conclusion, I find that the NAPP plates are parts of printing
machinery, and fall within the purview of item 668.50, TSUS, as
claimed by plaintiff. Therefore, the merchandise is properly dutiable
at the rate of 6 per centum ad valorem, as provided for in item
668.20, TSUS, as modified.

Judgment will be entered accordingly.